UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
UNITED STATES OF AMERICA,

                15 CR 88 (SJ) (RER)

     v.

                <u>MEMORANDUM
AND ORDER</u>


ADAMOU DJIBO,

       Defendant.
-------------------------------------------------X

*A P P E A R A N C E S*

ROBERT LLOYD CAPERS
UNITED STATES ATTORNEY
271 Cadman Plaza East
Brooklyn, NY 11201
By:    Karen Koniuszy
*Attorney for the Government*

LAW OFFICE OF ZACHARY MARGULIS-OHNUMA
260 Madison Avenue
18th Floor
New York, NY 10016
By:    Zachary Margulis-Ohnuma
*Attorney for Defendant*



**JOHNSON, Senior District Judge:**

1

On January 11, 2015, an individual ("Cooperator") was stopped at John F. Kennedy International Airport ("JFK") after arriving on a flight from Casablanca, Morocco. The Cooperator was found to have over six kilograms of heroin in his suitcase. Upon arrest, the Cooperator waived his Miranda rights and notified agents of the United States Department of Homeland Security, Homeland Security Investigations ("HSI") that he received the heroin from an individual in Togo and was planning to deliver the heroin to defendant Adamou Djibo ("Defendant" or "Djibo") here in the Eastern District of New York. The Cooperator claimed this was his second time importing heroin from Togo, the first trip having been in May 2014. Immigration records confirmed an "April/May 2014" trip. The Cooperator told agents that Djibo arranged both trips.

The Cooperator's phone was seized and searched. The Cooperator provided what he said is Djibo's telephone number and email address. Text messages (either using the phone's regular messaging platform or a text application called "WhatsApp") were received from this number and the messages appeared to be coded. Discussions centered around going to a "doctor" who would perform "surgery" on either one, two or three "hands." The agent believed the "hands" referred to suitcases; the "surgery," the trips; and the "doctor," the individual abroad providing the drugs. Emails were also recovered from the Cooperator's phone from the address he claimed was Djibo's. Flight reservations were sent from this address to the Cooperator, and the reservations listed Djibo's telephone number

2

(rather than the actual traveler) as the contact number associated with the reservation. Indeed, the Cooperator informed the government that he never made travel plans himself.

On December 7, 2014, Djibo sent a text message to the Cooperator indicating that it was the "7th anniversary since our first surgery." On December 21, 2014, Djibo asked the Cooperator for his "acct #" for "the prescriptions." On December 26, 2014, the date the Cooperator most recently left the United States for Togo, Djibo sent him a photograph of a bank deposit slip reflecting a cash deposit into the Cooperator's account. While the Cooperator was abroad, he sent a text message to Djibo stating that he would "go straight to the recovery room as usual" upon his return to the United States. The Cooperator told agents that this meant they would meet at a Best Western Hotel in Jamaica, New York. On the evening of January 11, 2015, the Cooperator was arrested upon his return to JFK and did not make it to the Best Western Hotel. A final (and unanswered) message from Djibo was sent to the Cooperator: "Bro r u k [*sic*]?"

At the first of four suppression hearings, HSI Special Agent Thomas Wilburt ("Wilburt") testified that, as a result of the information provided by the Cooperator, Wilburt set up an alert to notify him of Djibo's travel plans. At the time, Djibo was set to fly to the United Kingdom sometime in the spring but on February 1, 2015, Djibo advanced his trip to February 3, 2015, and was set to

3

depart on KLM Flight 644, with a final destination of London.   Wilburt was so

notified, and went to JFK's Terminal 4, from which KLM Airlines operates.

Wilburt then contacted officials from the United States Customs and Border Patrol

("CBP") and instructed them to screen Djibo in a walkway "five or six feet before

the actual jet way."   According to Wilburt, Djibo "was stopped for a border

enforcement exam.  They were checking to see if he was leaving with any money."

Wilburt defined the search as one for "contraband," and when asked by the Court to

define contraband stated:

> If they're leaving with any weapons, any – mostly it's money, I
> think, they're looking for.  Drugs as well.  Drugs, often they'll go
> to Bermuda.  Drugs come in here and go to Bermuda, as opposed
> to Bermuda from here.  This particular case, the main search was
> for money.

CBP officers asked Djibo to fill out a declaration form typically meant for

inbound passengers, CPB Form 6059.  The form asks the passenger, inter alia, to set

forth the amount of currency he or she is carrying.  Wilburt testified that at that

time, Djibo was asked (presumably by CBP) to move "off to the side, maybe seven

or eight feet away...from the line where he was stopped."  Indeed, CBP's report

indicates that Djibo was "escorted to a private area for inspection." (Exh. 1 to Dkt.

No. 59.)  Wilburt, at this time, stood "two or three feet away" from Djibo and the

CBP officers.

Two CBP officers checked Djibo's bags, found his declaration form to be

accurate and the amount of outbound currency to be legal. They found no other

contraband.  Djibo was, however, found to be carrying a number of cellular phones including, inter alia, an iPhone5 (the "iPhone").  At this point, Wilburt approached and asked for both the phone number to the iPhone5 and its passcode.  Wilburt testified that these questions are "part of the whole border enforcement exam." Djibo answered Wilburt's questions and was then arrested, taken to a processing room and read his Miranda rights.  He invoked those rights and the questioning ceased.

On cross-examination, Wilburt could not testify as to when and where the passcode was first entered into the iPhone:[1]

| | |
|---|---|
| Counsel: | Now at some point, you say somebody asked Mr. Djibo to put his password into his phone.  Is that correct? |
| Wilburt: | No. |
| The Court: | What did you say? |
| Wilburt: | I never said Mr. Djibo put the password in his phone. |
| The Court: | I understand that.  What did you say? |
| Wilburt: | I don't understand the question. |
| The Court: | With respect to he's asking you about Mr. Djibo putting the password into his cell phone.  Do you recall that conversation or that testimony you gave? |
| Wilburt: | I don't recall testifying that he put his passcode into the phone. |

---

[1] Unless otherwise noted, all emphases in the hearing transcripts have been added.

5

[…]

| | |
|---|---|
| Counsel: | After they took his boarding pass and his passport, his password was put into his phone.  Is that right? |
| Wilburt: | *I don't know that his password was put into his phone then, no.* |
| Counsel: | Not his password, his passcode. |
| Wilburt: | His passcode, *I don't know that his passcode was put into his phone.* |
| Counsel: | You never saw his passcode get put into his phone? |
| Wilburt: | *I don't believe it was put into his phone then, no.* |

[…]

| | |
|---|---|
| Wilburt: | *Yeah, I don't know that that password was put into that phone at that particular time.*  I asked him for the password and he provided it to me. |
| Counsel: | Was this during—was this after he was arrested that you asked for the password? |
| Wilburt: | No. |
| Counsel: | Was it during the currency examination? |
| Wilburt: | During the border enforcement exam, I asked him for the password. |

[…]

| | |
|---|---|
| Wilburt: | *At some point, I put it into his phone.  I don't know if I did it right then or I did it back at our office.* |

At the second hearing, Wilburt was recalled to the stand by the Court.  He again could not testify as to what was observed on the iPhone

6

during the alleged border search.  However, his memory appeared to be

refreshed on the issue of when the passcode was entered:

> The Court:    Let's go back to the time when Mr. Djibo was on his way out of the country and he was stopped by – what do you call, the CB's.
>
> Wilburt:    CBP.
>
> The Court:    And I think they made some inquiries.  And after the inquiries, was any contraband, anything found on him?
>
> Wilburt:    No.
>
> The Court:    Okay. And then there came a time that you asked him for the code to his phone. Is that correct?
>
> Wilburt:    Yes.
>
> The Court:    What was that for?  What was the purpose of that?
>
> Wilburt:    To get the password to his phone.
>
> The Court:    Did he give it to you?
>
> Wilburt:    Yes.
>
> The Court:    *And did you use it?*
>
> Wilburt:    *At a later point, yes.*
>
> The Court:    What do you mean, at a later point?
>
> Wilburt:    I know there was a question whether I put the password in the phone at that time. I don't believe I put it in right when he asked me. *I believe it was after the exam was over and after he was arrested, we went back to our office, and then I proceeded to put that code into the phone.*
>
> The Court:    And did you receive any information?
>
> Wilburt:    Yes.

7

The Court:       What information did you receive?

Wilburt:         At that point – we have a device called a Cellebrite device. That device pulls all the information off the phone. So another agent used that device after inputting the password, and obtained all the information off the phone that we were able to.

The Court:       *Now, a month later . . . somebody in law enforcement applied for a search warrant. What was the purpose of that?*

Wilburt:         *We wanted to get more in depth in the phone. Cellebrite, as far as I know, gives you basic information. I wanted to do an actual forensic analysis of the phone to get us more information; specifically anything that might have been deleted or anything like an email type information. I believe in our initial search we were mainly going for contact lists, call logs, and any text messages. The forensic examination of the phone, I felt , would give us more types of messaging types of [sic] applications.*

[...]

The Court:       Now, was that just for the phone or the SIM cards?

Wilburt:         That was for everything. *I wanted a more in depth examination of all the electronic devices.*

The Court:       Now after you received the passcode, was it four letters?

Wilburt:         It was four numbers.

The Court:       Four numbers. You returned it to the defendant?

Wilburt:         Umm…

The Court:       What did you do?

Wilburt:         Initially, if I may explain. The officers were searching his bag. I initially – he asked for any phones that he had. He provided one phone to me.

8

I asked him if he had any other phones. He said no. The officers then, as they were conducting the exam, found two other phones. I saw the two other phones and I asked him for the password. He gave me the password.

[…]

Wilburt: The phones then, I think they might have been put right back into the bag. I know CBP gave them to me. I looked at them. *I don't remember holding them in my hand.* I think I just put them right back in the bag.

The Court: Where was the bag?

Wilburt: The bag was in the middle of two CBP officers, myself and Mr. Djibo. The bag was a foot to my left, a foot in front of him, and you know, pretty much in between all of us.

The Court: And who had custody of the bag?

[…]

Wilburt: I would say the CBP officers were going through the bag so they would have the custody of bag at that time.

[…]

The Court: Now let me ask again, what information did you derive when you put that passcode into the phone?

Wilburt: Well, we put the password into the phone, then it's hooked up to the Cellebrite, which will download information. We generally will do a basic search, because it takes too long to get everything. And you'll search and you'll request text messages, call logs and contact lists.

The Court: Were there any text messages or incriminating calls to the original defendant?

9

| | |
|---|---|
| Wilburt: | At a later point looking at that report, I believe there were text messages. |

While Wilburt repeatedly described the search as one for "contraband," specifically "currency," and admitted that CBP found neither on Djibo's person nor among his effects, at the conclusion of the fourth hearing, the government's definition of "contraband" changed to incorporate what Wilburt had in fact found:

| | |
|---|---|
| The Court: | So it's your position you can look at a cellphone or a laptop for a person going out of the United States to look for currency? |
| Government: | To look for evidence of currency or other crimes, yes. |
| The Court: | You're looking for currency or evidence of currency? |
| Government: | Evidence of illegal activity. Evidence of bulk cash smuggling typically is what they are focused on. It might be text messages or emails or things of that nature. |

As the Court continued to inquire, the government's version of events became increasingly muddled.

| | |
|---|---|
| The Court: | Okay. Now, they searched the phone at the border as he's going out and what did they seize? |
| Government: | They didn't seize anything at that time. They asked him for his passcode. I think they tried to turn on the device to – actually I'm not sure if they turned it |

10

on at that point. But they searched his luggage. They searched his person. And they found no evidence of bulk cash smuggling or additional crimes of that nature so CBP finished their exam and stepped out of the situation...We then obtained a search warrant.

[...]

The Court: Which is a month later.

[...]

Government: To search the phone forensically and look for evidence of the drug importation conspiracies that he had been charged with.

[...]

The Court: Why would you do that if you already had the password?

Government: *So [that] we didn't violate his rights.*

[...]

The Court: Are you sure that nothing was seized at the border? Any information?

Government: I believe after – nothing was seized from the phone at the border search. *After he was arrested,* I believe they ran an initial Cellebrite report or an initial search on the phone, *just a preliminary peek.*

[...]

The Court: I'm not too clear. What, if anything, was retrieved from the phone at the border.

Government: Nothing....He was stopped at the border. Nothing was taken from his phone at that time. He made a statement---

The Court: Then why did they ask for the code?

11

| | |
|---|---|
| Government: | *I believe they were looking into the phone – they peeked at the phone after – so he was pulled aside from the line at the airport.* |
| The Court: | I understand that. They peeked at the phone. What was the result of that peek? |
| Government: | I believe the initial search turned up some records that – it basically captures the data that's undeleted. It captures, like, your text messages and your emails. |
| The Court: | What was that? I want it to be more specific. |
| Government: | It was emails, text messages, undeleted content. So whatever was – when you turn on your phone and you see your text messages and you see your emails, that's what they obtained in this initial peek? |

The Court requested a copy of what the government called a "peek," whereupon the government surprisingly revealed that the report would be voluminous.

| | |
|---|---|
| The Court: | Can you give me a copy of what was learned, the peek at the border? |
| Government: | Okay. |
| The Court: | Number two, how do I know that that's not the fruits of the search for the search warrant? |
| Government: | We're volunteering not to use it. *We'll suppress the peek—whatever results came from the peek.* |
| [...] | |
| The Court: | Can you give me a list of whatever you have on what they seized or what they saw at the border? |

12

| | |
|---|---|
| Government: | You want the forensic report?  It's hundreds of pages.  It's a very large file.  I'm happy to put it on a CD for you and you can look at it. |
| […] | |
| The Court: | Give me a list of what they saw at the border itself. |
| Government: | The records are hundreds of pages.  Do you want me to put them on a CD? … We have the phone records from the border search and we have the phone records after the search warrant. |
| The Court: | Pre-search warrant. |
| Government: | Pre-search warrant we have the phone records that the government is voluntarily agreeing not to use or rely on.  But we have them. |
| The Court: | And how many pages is it? |
| Government: | Hundreds. |

It took three weeks for the government to provide the CD, delivering a copy to the Court after the close of business on Friday, October 23, 2015.  The CD contained 921 pages of materials, all of which this Court has reviewed, including hundreds of text messages, WhatsApp messages, photographs and emails.  Many of the messages appear to be written in code.  For example, there are text messages about orders for 600 cases of diapers and 1500 cases of wipes; "booking confirmations" to a "personal trainer" who provides various styles of "sessions;" and about stomach ailments that have to be operated on in Ghana.  There is also a

13

communication with a "lawyer" about falsifying marital information in order to obtain United States citizenship.

In addition to volunteering to "suppress the peek," the government also argues that it could have obtained the information, and the subsequent data obtained pursuant to the search warrant, without knowing the passcode. To that end, the Court took the testimony of Special Agent David Bauer ("Bauer") of the Department of Homeland Security. Bauer testified that he has been a forensic examiner for three years in the Department's computer forensic division. He holds a degree in psychology from the State University of New York at Albany and testified to having "another degree in radiological technology." Bauer testified that his training includes programs offered at the Federal Law Enforcement Training Center, the Secret Service, the Internet Crimes Against Children Task Force, the National White Collar Crime Center and "advanced training in mobile devices through a local private vendor."

Bauer described a "fairly new" device called an IP-Box, which can be attached to an iPhone and systematically attempt every passcode from 0000 to 9999 without shutting down using what the industry refers to as "brute force." IP-Boxes came into the fray when the Apple Inc. ("Apple") refused to assist the government with cell phone break-ins.

14

However, on cross-examination, Bauer admitted that he did not actually attempt to break into Djibo's phone, as the passcode had been removed by the time he received the phone. He also admitted that, as of the date of his testimony, he had never successfully broken into an iPhone5 installed with the iOS 8.1.2 operating system, which is the configuration of Djibo's phone. Bauer's conclusion that the government could have broken into the phone without the passcode rested on two principles:

> One, I have spoken with other examiners who have actually broken passcodes on phones that have operating systems that are more recent that this particular version that we are talking about in your [Djibo's] phone. Those versions would arguably be more secure and more difficult to break into. So I have that. The other thing is, there's actually some new information that's been released since my last testimony that would have also provided another option to get into this phone, which we just found out about recently.

Bauer could not recall who the "other examiners" were but testified that they were local law enforcement, possibly in Bergen County, New Jersey, and that he spoke personally to the author of the paper that he referenced and that author informed him that an iOS 8.1.2 break-in is possible. The paper was not offered into evidence. Furthermore, Bauer testified that

> [I]n terms of real world devices, I've had success with one. I've also done and had some success with other exemplar devices. Again, we are pretty limited by the pool of what we have available. But I've had some varied success in that regard as well.

15

Bauer could not provide a success rate, stating that "it's very finicky." In total, Bauer has tested one "real world phone" and two exemplar phones that he has tested five to ten times with some success, but never an iPhone5 operating on iOS 8.1.2.

Less than a week after the final suppression hearing in this case, the government, in another case pending in this district, moved to compel Apple to assist in a narcotics distribution investigation by unlocking an iPhone5. See In Re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by This Court, 15 MC 1902 (JO) (filed October 8, 2015). In that case, the government consulted with Bauer and determined that use of an IP-Box to break into a phone operating on iOS 7 "presents a non-trivial risk of data destruction." In other words, in that case the government determined that IP-Box could actually cause the erasure of the entire phone's contents and was not a recommended or effective method of retrieving information from a passcode-locked phone, compared to forensic analysis. (See id. at Dkt. No. 21 at 7-8 (discussing the government's talks with Bauer and conclusion that IP-Box could "render the Target Phone permanently inaccessible.")

On July 1, 2015, Djibo moved to suppress all statements made during the course of Djibo's arrest, "including his statement identifying the password to his iPhone" and all property seized, including "data retrieved from his iPhone pursuant

16

to a subsequent search warrant," pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). The government opposes on several grounds. First, the government claims that Djibo was not in custody until he was formally placed under arrest and therefore, the <u>Miranda</u> warning was not required during the border search. Second, the government argues that the "statements and property were obtained pursuant to a border search" and thus there can be no "fruit of the poisonous tree." Finally, the government argues that the information on the phone would have been discovered even in the absence of its inquiring as to Djibo's passcode.

DISCUSSION

*Fifth Amendment Challenge to Statements Made at the Border*

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself. U. S. Const. Amend. V. "To protect the Fifth Amendment right against self-incrimination, the Supreme Court in <u>Miranda v. Arizona</u> ruled that police may not interrogate a suspect who has been taken into custody without first warning the person 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" <u>United States v. Newton</u>, 369 F.3d 659, 668 (2d Cir. 2004); <u>see also</u> <u>Georgison v. Donelli</u>, 588

17

F.3d 145, 155 (2d Cir. 2009) ("It is well settled that Miranda requires all individuals who are under arrest, or otherwise in police custody, to be informed prior to interrogation, inter alia, of their right to remain silent and to have an attorney present during questioning."). Analysis of "custody," for purposes of Miranda, involves whether a reasonable person in the suspect's position would have understood himself to be subjected to restraints comparable to those associated with a formal arrest. See id., 588 F.3d at 155 (quoting Berkemer v. McCarty, 468 U.S. 420, 441 (1984)).

In the context of arriving at an airport—"in which compulsory questioning inheres in the situation and the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border"—a reasonable traveler will expect some constraints and questioning. United States v. FNU LNU, 653 F.3d 144, 153-54 (2d Cir. 2011). Correspondingly, an individual *departing* from a United States airport will have similar expectations. Cf. Corbett v. Transp. Sec. Admin., 2014 WL 2503772, at *1 (11th Cir. June 4, 2014) ("Before boarding commercial flights at U.S. airports, all passengers must submit to screening of their persons and luggage at a security checkpoint.") (citing 49 U.S.C. § 44901); United States v. Stanley, 545 F.2d 661, 667 (9th Cir. 1976) (noting, in the context of a border search absent a warrant and probable cause, that an individual departing the United States is "on notice that a search may be made, and his privacy is arguably less invaded by such search"). Thus, "with these expectations in mind, the

18

likelihood that a reasonable person being questioned by CBP officers on a jet way would consider himself or herself under arrest is diminished, but of course still possible." United States v. Soto, No. 13-CR-76 MKB, 2014 WL 3695990, at *4 (E.D.N.Y. July 24, 2014). The Court must view the totality of the circumstances, including "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion." FNU LNU, 653 F.3d at 153 (citations omitted). Additionally, in the border context, a relevant consideration is the nature of the questions being asked. Id.

In this case, there has been no credible evidence presented that the search was of unreasonable duration, that any weapons were drawn, restraints used, or that it was conducted in a particularly confining location, although it was "private." These factors support a finding that Djibo was not in custody. In terms of voluntariness, while Djibo did not ask to be selected, he did intend to travel internationally and as stated, supra, that choice makes the interaction voluntary enough for the purposes of this analysis.

However, three important factors lead this Court to conclude that Djibo was in fact in custody at the time of the statements at issue. First, Djibo was not free to

leave once he was asked to step aside "to a private area" for the currency exam. Second, and more significantly, Wilburt – an HSI Agent – was several feet away from the CBP officers' table while the currency exam took place. It appears from his testimony that he stood by passively until the phones were discovered, but phones are not contraband. In fact, no contraband was found by CBP. After that, the border search ended. The line of inquiry into Djibo's telephones thereafter completely changed the stage because the purpose of the original search was to find currency and currency cannot be found on a phone.

The government cites to FNU LNU for the proposition that the search of Djibo did not require Miranda. However, that case is distinguishable on significant grounds. In FNU LNU, a woman arrived into JFK from the Dominican Republic and presented a passport for inspection. 653 F.3d at 146. The passport bore the name Sandra Calzada, a United States Citizen born in Puerto Rico ("Calzada"). Calzada's name appeared on a New York City Police Department arrest warrant. As a result, the passenger was escorted to secondary inspection. There, she endured 90 minutes of un-Mirandized questioning about her identity. She continually gave incorrect or suspicious answers about Calzada's pedigree, was denied permission to enter the United States and ultimately indicted for making a false statement in connection with a passport application, misusing a passport and aggravated identity theft. In a concurring decision affirming the district court's denial of a motion to suppress, Judge Jacobs found that "[p]ractically speaking, the

*most* important factor in determining whether *Miranda* applies at our borders will often be the objective function of the questioning." 653 F.3d at 155 (Jacobs, J., concurring) (emphasis in original).  This is such a case.  The Court finds that the function of the questioning of an inbound passenger to establish her identity is fundamentally different from the function of the questioning of an outbound passenger about currency through the use of his cell phone.  Finally, it should be taken into account that Djibo was asked to execute an inbound passenger customs declaration form, an aberration that "would raise the suspicions of an ordinary traveler." Soto, 2014 WL 3695990, at *5.

In sum, while there are factors bearing on either side of the equation, this Court finds that Djibo was in custody when Agent Wilburt inquired about his phone numbers and his passcode, and therefore, those statements are suppressed.

*Fruit of the Poisonous Tree*

Next, Djibo asks the Court to suppress the evidence obtained pursuant to the search warrant as the fruit of a warrantless search.[2]

Djibo's unMirandized statements about his telephone and passcodes were followed by a warrantless search of his iPhone5.  This search may have begun in

---

[2] The government has already agreed to "suppress the peek" and not use any evidence obtained from that search in its case in chief.  Therefore the motion to suppress as to that evidence is granted.

P-049

the jet way area where he was pulled further aside by Wilburt once the phones were discovered but the search was admittedly continued later, after his arrest, when it was hooked up to Cellebrite and 921 pages of information, which the government calls a "peek," and which the Court has reviewed, was revealed. The government agrees that this "peek" is a fruit of the un-Mirandized statements, and, contrary to the government's representation, this Court has found what it believes to be incriminating information within that "peek." What is left to be determined is whether the further search of the phone, pursuant to the March 3, 2015 warrant, is also the fruit of an illegal search.

Answering that question in the negative, the government directs the Court to United States v. Patane, 542 U.S. 630 (2004). It that case, police arrived to arrest Patane for allegedly contacting his ex-girlfriend in violation of a restraining order. One of the two officers who appeared at Patane's residence was a Detective Benner who "worked closely with the Bureau of Alcohol, Tobacco and Firearms" and had been informed by a county probation officer that Patane was in illegal possession of a firearm. 542 U.S. at 634.

While arresting Patane for violating the restraining order, Detective Benner began to read the Miranda warnings, whereupon Patane interrupted, telling Benner that he knew his rights. Benner stopped issuing the warning after informing Patane of the right to remain silent, but questioned Benner about the weapon. Benner said,

22

"I am not sure about the Glock because I don't want you to take it away from me." Id. at 635. After some back and forth, Patane gave the officers permission to retrieve the weapon from his bedroom.

In a plurality decision written by Justice Thomas and joined by Chief Justice Roberts and Justice Scalia, the Court upheld admission of the Glock, finding that only the statement "I am not sure about the Glock because I don't want you to take it away from me" invoked the Fifth Amendment privilege from self-incrimination. In the Court's view, admission of the actual Glock did not violate the Fifth Amendment because the Self-Incrimination clause only demands that "[n]o person . . . be compelled in a criminal case to be a witness against himself." U.S. Const. Amend. V; see also id. at 637-39. Thus, the Court's focus was on "unwarned statements" being used by the prosecution in its case-in-chief and it found that the Fifth Amendment did not extend in that case beyond suppression of the statement alone. Id. at 640. Justices Kennedy and O'Connor concurred in the judgment, finding admission of the Glock did "not run the risk of admitting into trial an accused's coerced incriminating statement against himself." Patane, 542 U.S. at 645 (Kennedy and O'Connor, J.J., concurring).

In the instant case, the government asks this Court to find that the warrantless "peek" into his phone is suppressible, but not the thousands of pages retrieved through a subsequent forensic search.

However, the discovery of Patane's Glock in his home and the discovery of the entire contents of Djibo's iPhone are vastly different searches. The former implicated only the Fifth Amendment's privilege against self-incrimination, the latter invokes the Fourth Amendment's freedom from unreasonable searches and seizures – in this case, a search.[3] In Riley v. California, 134 S.Ct. 2473 (2014), the Supreme Court held that warrantless searches of smart phones (phones that not only make telephone calls but operate as mini-computers with various storage capabilities) generally[4] do not qualify for the "search incident to arrest" exception to the warrant requirement under the Fourth Amendment. Id. at 2485, 2489-90. Writing the near-unanimous decision,[5] Chief Justice Roberts described cellular telephones as "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." Id. at 2484. The Court went on to describe in impressive detail how a cell phone is different from other physical objects that may be found on or near an arrestee:

> The term 'cell phone' is itself misleading shorthand; many of these devices are in fact microcomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps or newspapers.
>
> One of the most notable distinguishing features of modern cell phones is the storage capacity.....Most people cannot lug around every piece of mail they

---

[3] Djibo has not argued that the government did not have the right to seize his phone.
[4] The exceptions to Riley do not apply here.
[5] Justice Alito wrote an opinion concurring in the judgment.

24

have received for the past several months, every picture ever taken, or every book or article they have read.

[…]

The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph of two loved ones tucked into a wallet….A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a cell phone.

[…]

Historic location information is a standard feature on many smart phones and can reconstruct someone's specific movements down to the minute, not only around town but within a particular building.

Mobile applications…or "apps" offer a range of tools for managing detailed information about all aspects of a person's life.  There are apps for Democratic Party news and Republican Party News; apps for alcohol, drug, and gambling addictions; apps for sharing prayer requests; apps for tracking pregnancy symptoms; apps for planning your budget; apps for every conceivable hobby or pastime; apps for improving your romantic life…and the records of such transactions may be accessible on the phone indefinitely….Indeed, a cell phone search would typically expose to the government *far more* than the most exhaustive search of a house.  [A modern cell phone] contains a broad array of private information never found in a home in any form – unless the phone is.

123 S. Ct. at 2489-2491 (emphasis in original and citations omitted).  The government insists that the search warrant, obtained 30 days after Djibo's arrest (30 days during which the government had his phone and its passcode), was not in any way informed by what Officer Wilburt observed in the 921 page "peek," but was only based on the statements made by the Cooperator and the discoveries on the Cooperator's phone.  However, Officer Wilburt testified that after viewing the

25

"peek," he wanted more information that he believed to be on Djibo's phone. He did not testify that he sought the warrant in furtherance of what he was told by the Cooperator, which casts doubt on his credibility. In his affidavit in support of the application for a search warrant, he made no mention of having already looked at 921 pages of data from the phone. Therefore, not only was the initial search unreasonable (and even though it provided the government with text messages, WhatsApp messages, call logs and contacts), Agent Wilburt decided it was insufficient to support the narcotics investigation. He wanted "more." For these reasons, this Court finds that the forensic search of Djibo's phone was the fruit of the illegal initial search and was unreasonable. See, e.g., United States v. Kim, 2015 WL 2148070 (D.D.C. May 8, 2015), appeal dismissed (warrantless search of outbound passenger's laptop after failing to find contraband on passenger deemed "unreasonable" under the Fourth Amendment as national security concerns "somewhat attenuated" when a passenger is leaving the country). The government's claim that it did not rely on the initial "peek" – despite the wording of the search warrant—is simply unsupported by the often contradictory evidence. The government is also mistaken in its claim that the peek contained no incriminating statements.

The Court here declines to apply Patane to these facts for several reasons. As stated, supra, the Fourth Amendment protects individuals from unlawful searches and seizures. U.S. Const. Amend. IV. In Patane, not only did the arrestee

26

interrupt his own Miranda warning but he thereafter gave consent to search for the weapon. Djibo invoked the right to remain silent once Officer Wilburt gave him the Miranda warnings. One can conclude that he would not have given the passcode had the warning been given on time, i.e., prior to Wilburt's injection into the CBP exam when the phones were presented. Second, the incentive of deterring police misconduct is present in this case. Sufficient evidence existed to arrest Djibo outside of the airport, but Officer Wilburt chose to have Djibo searched under conditions in which the average passenger would not feel free to leave and he did so without issuing the Miranda warning. Wilburt's evasiveness during the Court's direct questioning further questions his credibility, answering the Court's question as to why he asked for the passcode with, "to get the passcode." It is the Court's opinion that Wilburt's intention was to expand the definition of "border search" in a way this Court cannot abide and in a way that invokes Wong Sun v. United States, 371 U.S. 471 (1963) (suppressing drugs found following a warrantless search as "fruit of the poisonous tree"), and its progeny. See generally Weeks v. United States, 232 U.S. 383 (1914); United States v. Alvarez-Porras, 643 F.2d 54, 59 (2d Cir. 1981) ("In order to effectuate the commands of the Fourth Amendment, to deter police misconduct, and to safeguard the integrity of the judicial process, the Supreme Court has fashioned the exclusionary rule which makes inadmissible at trial any evidence derived from the violation of an

individual's right to be free from illegal searches and seizures.") (quoting Wong Sun).

In this case, the search was undertaken to find contraband or currency and neither were found. There was no need to then seek out Djibo's passcode. It had nothing to do with national security at the airport on that day. Based on the line of Wilburt's questioning and Djibo's outbound status, this cannot be considered within the purview of a border search. That Djibo was arrestable based on the information obtained from the Cooperator is of no great moment. He could have been arrested, his phone seized pursuant to the border authority, and a search warrant obtained before any searching occurred. Wilburt sought to sidestep these constitutional guarantees.

The third reason Patane should not be applied here is because, as the Riley court held, a cell phone is not just a physical object containing information. It is more personal than a purse or a wallet, and certainly more so than the firearm that was used in evidence against Respondent Patane. It is the combined footprint of what has been occurring socially, economically, personally, psychologically, spiritually and sometimes even sexually, in the owner's life, and it pinpoints the whereabouts of the owner over time with greater precision than any tool heretofore used by law enforcement without aid of a warrant. In today's modern world, a cell phone passcode is the proverbial "key to a man's kingdom."

28

In terms of the cases cited by the government to support the search of electronics at the border, they are all inapposite. See, e.g., United States v. Linarez-Delgado, 259 F. Appx. 506 (3d Cir. 2007) (affirming sentence of leader of ecstasy importation ring where defendant held while entering United States with a camcorder that was searched and found to have incriminating evidence); United States v. Irving, 452 F.3d 110 (9th Cir. 2006) (inbound search of an admitted convicted pedophile's luggage revealing diskettes of child erotica deemed reasonable notwithstanding ongoing investigation); United States v. Young, 2013 WL 885288 (W.D.N.Y. Jan. 16, 2013) (Report and Recommendation recommending motion to suppress be denied where defendants entered the United States from Canada carrying 1-benzylpiperazine, a Schedule I controlled substance) (emphases added). In one example, the government even cited a decision affirming the district court's suppression of evidence, but cited the dissenting opinion. See United States v. Capers, 627 F.3d 470, 493-4 (2d Cir. 2010) (Trager, J., dissenting).

For the foregoing reasons, any documents obtained by virtue of Djibo providing his passcode are suppressed as either the fruit of the unlawful inquiry by Wilburt after the CBP search ended, and/or fruit of the admittedly poisonous "peek."

P-049

*Inevitable Discovery*

Finally, the government argues that Djibo's passcode was not required because they would have inevitably been able to hack the phone using IP-BOX. However, the government presented this evidence through one witness, Special Agent Bauer, who had not hacked into Djibo's phone or in fact any iPhone5 operating on iOS 8.1.2. Agent Bauer supported his testimony largely from hearsay stories from the field, which were vague, unsupported by documentary evidence, and his methods were even rejected by Assistant United States Attorneys who represented to a different Judge in this District that the IP-BOX is an unreliable tool to hack into an even less sophisticated phone than Djibo's, ultimately concluding that use of the IP-BOX could cause a "non-trivial risk of data destruction." This Court takes judicial notice of that action and those opinions of the government. See In Re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by This Court, 15 MC 1902, (E.D.N.Y. Oct. 28, 2015) (Dkt. No. 21 at 7-8 (finding IP-Box to be an unreliable tool for accessing passcode-protected iPhones). As the defendant has met his initial burden on the motion to suppress, and the government has failed to come forward with evidence justifying the warrantless search of the iPhone, the evidence obtained from Djibo's phone is hereby suppressed.

30

## CONCLUSION

For the foregoing reasons, the motion to suppress is granted.  SO

ORDERED.

Dated: December 16, 2015
       Brooklyn, NY

_____
Sterling Johnson, Jr., U.S.D.J.

31